## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DALIA SAHA, M.D.,

                  Plaintiff,

      v.

TELADOC HEALTH MEDICAL GROUP, P.A.,
*et al.*,

                  Defendants.

Case No. 23-cv-3188 (JMC)

## <u>MEMORANDUM OPINION</u>

Before the Court are Defendants Teladoc Health Medical Group, P.A. (Teladoc), Demetrios Themelis, and Derek Bennetsen's motions to dismiss Plaintiff Dalia Saha's complaint.[1] Saha previously worked as a contracted physician for Teladoc—a telemedicine healthcare services provider. She later resigned. She alleges that Teladoc and two of its employees, Themelis and Bennetsen, relayed false information to and about her that ultimately interfered with her ability to retain clients and secure prospective employment. Her complaint alleges two causes of action: tortious interference with economic expectation and tortious interference with contract. Themelis and Bennetsen seek dismissal for lack of personal jurisdiction, and all Defendants move to dismiss Saha's complaint for failure to state a claim. After considering the Parties' arguments, the Court agrees with Defendants and grants their motions to dismiss.

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

## I.    BACKGROUND

Plaintiff Dalia Saha's complaint alleges the following. Saha is a board-certified internal medicine physician. ECF 1-2 ¶ 1. She is licensed to practice in 15 states, including the District of Columbia. *Id.* In December 2016, Saha began working as a D.C.-based independent contractor for Defendant Teladoc—a multi-state virtual and telehealth healthcare services provider. *Id.* ¶¶ 7–9. Briefly, this is how the service works: Patients seeking a physician consultation through Teladoc can request an appointment by telephone or online. *Id.* ¶¶ 13, 17. A Teladoc employee will then contact one of its contracted physicians, like Saha, to explain the patient's case and provide the physician the option to accept or decline the patient. *Id.* ¶¶ 13–15. If the physician accepts, she contacts the patient to conduct a virtual medical consultation. *Id.* ¶ 19. After the consultation, the physician enters her notes, findings, and prescription information into the patient's chart. *Id.* ¶¶ 22–24.

In January 2019, Saha alleges that she exchanged emails with Derek Bennetsen, Teladoc's senior medical director, "under the auspices of Teladoc's quality assurance program." *Id.* ¶ 28. The purpose of that program was to work with physicians "to improve the quality of medical care and patient experience." *Id.* Saha alleges that she followed the directives Bennetsen gave her in connection with his quality assurance review, *id.*, and even received positive feedback from him in February 2020, *id.* ¶¶ 28–29. But, in April 2020, Bennetsen emailed Saha to relay concerns about his review of her medical charts. *Id.* ¶ 30. He claimed that her charts reflected symptoms and complaints that were unrelated to the reasons for the patients' visits and that prescriptions and medication dosages were not correct. *Id.* In his email, Bennetsen told Saha that because of "the number of fails" he would escalate the matter to the Clinical Quality Executive Committee (CQEC) for further action, which could include a performance improvement plan (PIP). *Id.*

About two months later, on June 19, 2020, Bennetsen emailed Saha to inform her that the CQEC decided to place her on a 30-day PIP. *Id.* ¶ 32. As a result of the PIP, Teladoc limited Saha to no more than ten consults per day, required her to accurately record her notes, and mandated that there be no discrepancies with her prescriptions. *Id.* Bennetsen also advised that the CQEC would review her charts at the end of the 30-day period for compliance and potentially terminate her if she did not successfully complete the PIP. *Id.* Finally, Bennetsen told Saha that if she declined to participate in the PIP, Teladoc would construe her refusal as a resignation while under formal investigation, which "may trigger a National Practitioner Database Report" (NPDB). *Id.* ¶ 32. The NPDB is an online database that contains adverse action reports about health care professionals.[2] Saha responded acknowledging receipt of Bennetsen's email, committing to improving her work, and asking some specific questions about the PIP (to which Bennetsen responded). *Id.* ¶¶ 33–34.

At the end of the 30-day PIP period, on July 20, 2020, Bennetsen emailed Saha to complain about "insufficient data" from her patient charts, which reflected that she had not performed a Teladoc consultation since July 9. *Id.* ¶ 35. Bennetsen's email prompted a back-and-forth exchange between the two about Saha's PIP. Saha told him that she had been asked to assist in the hospital and had been picking up more inpatient shifts in lieu of Teladoc consults. *Id.* ¶ 36. In his responses, Bennetsen explained that by failing to perform consults for about 10 days of the review period, Saha had failed to successfully complete her PIP. *Id.* ¶¶ 37, 39. He stated that he would share this

---

[2] The NPDB is operated by the U.S. Department of Health and Human Services. *NPDB*, U.S. Dep't of Health and Human Services, https://perma.cc/ETW2-SF8R. Pursuant to the Health Care Quality Improvement Act of 1986, "[e]ach health care entity which . . . accepts the surrender of clinical privileges of a physician . . . while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct" must report such action to HHS. 42 U.S.C. § 11133(a)(1)(B)(i).

information with the CQEC, who would then determine whether her employment would continue. *See id.* Perhaps seeing the writing on the wall, Saha resigned shortly thereafter. *Id.* ¶ 40.

After she resigned, Saha received a notification that Themelis, Teladoc's credentialing manager, reported Saha's resignation to the NPDB. *Id.* ¶ 41. She appealed to Teladoc, but Teladoc denied her request and maintained its position that her resignation was required to be listed in the NPDB. *Id.* ¶¶ 43–44.

In August 2023, Saha filed this lawsuit against Defendants in the Superior Court for the District of Columbia alleging tortious interference with economic expectation and tortious interference with contract. Her complaint alleges that Bennetsen gave her false information, and that he did so knowing that she would rely on that information "in the timing and manner of her resignation from Teladoc," *id.* ¶ 49, and "in her appeal," *id.* ¶ 50. She also claims that he supplied misleading information about her to Teladoc, knowing that Teladoc would rely upon that information in making decisions about her employment. *Id.* ¶ 53. Her allegations against Themelis include that he "knew, should have known, or chose not to determine if the information in the report he had written concerning Dr. Saha was false, misleading or incomplete." *Id.* ¶ 70. According to her complaint, Teladoc is responsible for the actions of its employees and has an independent obligation to evaluate the performance of its employees, which she claims it did not fulfill here. *Id.* ¶¶ 59–67. She alleges that as a result of Defendants' conduct, current and prospective clients have "declined to hire and otherwise retain" her, *id.* ¶¶ 75, 77, and that "[e]ach of the Defendants knew there was a reasonable probability that Dr. [Saha] intended to and would enter into a business relationship as a physician with other medical providers," *id.*—suggesting that they purposefully (or at least recklessly) supplied false information to her and others knowing that it would interfere with her ability to work as a doctor.

Defendants removed Saha's action from the Superior Court to this court pursuant to 28 U.S.C. § 1441. *See* ECF 1. Each Defendant separately moved to dismiss. ECF 5, 6, 22. Saha opposed each of the Defendants' motions. ECF 9, 10, 11, 25. All pending motions are fully briefed and ripe for review.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, "the plaintiff has the burden of establishing a factual basis for the exercise of personal jurisdiction over the defendant." *Crane v. N.Y. Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990) (citing *Reuber v. United States*, 750 F.2d 1039, 1052 (D.C. Cir. 1984)). To meet this burden, the plaintiff "must allege specific acts connecting the defendant with the forum," as "[c]onclusory statements . . . do not constitute the prima facie showing necessary to carry the burden of establishing personal jurisdiction." *First Chicago Intern. v. United Exch. Co., Ltd.*, 836 F.2d 1375, 1378–79 (D.C. Cir. 1988). This requirement "must be met as to each defendant." *Rush v. Savchuk*, 444 U.S. 320, 332 (1980). When considering whether personal jurisdiction exists, the Court "may receive and weigh affidavits and other relevant matter to assist it in determining the jurisdictional facts." *United States v. Philip Morris Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000). Any factual discrepancies are resolved in the plaintiff's favor. *Crane*, 894 F.2d at 456.

To withstand a Rule 12(b)(6) motion, a complaint must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating a motion to dismiss under Rule 12(b)(6), a court must "treat the complaint's factual allegations as true" and afford the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). That said, a court "need not accept inferences

drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).

## III.    ANALYSIS

The Court finds that Saha has not met her burden to establish a factual basis for exercising personal jurisdiction over Themelis and Bennetsen and that jurisdictional discovery is unwarranted. The Court also agrees with Defendants that Saha's complaint fails to allege facts sufficient to state either a tortious interference with contract or tortious interference with prospective economic advantage claim and thus dismisses this case in its entirety. The Court explains the bases for its decision below.

### A.  The Court dismisses Saha's claims against Themelis and Bennetsen for lack of personal jurisdiction under Rule 12(b)(2).

#### 1.  *Saha has failed to show any reasonable connection that Themelis and Bennetsen have with the District.*

The Court begins with Themelis and Bennetsen's motions to dismiss for lack of personal jurisdiction. ECF 5; ECF 22. Both Defendants have submitted declarations swearing that they are not residents of the District of Columbia, and Saha does not dispute that. *See* ECF 5-2 (Themelis Decl.); ECF 22-2 (Bennetsen Decl.); *see generally* ECF 10-1; ECF 25. The Court thus employs a two-prong inquiry to determine whether it has jurisdiction over these nonresident defendants. The Court must first "examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). The District of Columbia's long-arm statute provides for:

> personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . . 1) transacting any business in the District of Columbia; (2)

6

contracting to supply services in the District of Columbia; (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

D.C. Code § 13-423(a)(1)-(4).

If the Court finds that it can exercise personal jurisdiction under the long-arm statute, it then moves to the second part of the analysis to determine whether exercising jurisdiction is constitutional. For personal jurisdiction to comport with the Due Process Clause, a defendant must "have certain minimum contacts with . . . [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Here, the Court finds that Plaintiff has not satisfied her burden to establish that the Court has jurisdiction over Bennetsen and Themelis under the District's long-arm statute, which warrants dismissing the claims against them.

Defendants have submitted sworn declarations affirming that they do not reside in the District of Columbia. *See* ECF 5-2 ¶ 2 (Themelis stating that he is a resident of New Hampshire); ECF 22-2 ¶ 2 (Bennetsen stating that he is a resident of Arizona). Both also state that they have not visited or intentionally interacted with the District of Columbia for personal reasons for many years and have never visited or intentionally interacted with the District for work. *See* ECF 5-2 ¶ 5–6; ECF 22-2 ¶ 5–6. On the other hand, Saha proffers no competing allegations about where Defendants reside, work, or solicit or conduct their business.[3] For Themelis, she seems to believe

---

[3] While Saha included allegations about personal jurisdiction in her complaint, ECF 1-2 ¶ 5, the Court recognizes that a plaintiff has "no obligation to make specific allegations relevant to personal jurisdiction in [the] complaint because lack of personal jurisdiction is an affirmative defense and so must be raised by the defendant." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1090 (D.C. Cir. 1998). But a plaintiff does have an "obligation to make some allegations relating to personal jurisdiction … after [defendant] [has] filed [his] motion to dismiss and supporting affidavit. *Id.*

that the "Court has personal jurisdiction over [Themelis] because [his] tortious conduct was directed towards a resident of the District of Columbia and related to the performance of her occupation in the District of Columbia." ECF 1-2 ¶ 5. She makes the same argument about Bennetsen, but further argues that Bennetsen's emails to Saha, regarding Saha's performance at Teladoc, are sufficient contacts with D.C. to confer jurisdiction under subsection (a)(4). Saha claims that the emails "represent a long-standing pattern of relevant interactions between Dr. Saha and Defendant Bennetsen over a considerable period of time during which she was physically located in the District of Columbia." ECF 25 at 4. Bennetsen counters that exchanging emails, while out-of-state, with a D.C. resident cannot establish personal jurisdiction. ECF 22-1 at 4.

The Parties dispute whether contacts with a forum on behalf of an employer may be considered in the personal jurisdiction analysis. Bennetsen and Themelis claim that personal jurisdiction over employees must be based "on their personal contacts with the forum and not their acts and contacts carried out solely in a corporate capacity." ECF 5-1 at 4; ECF 22-1 at 4. Saha counters that contacts in a corporate capacity are still relevant to the analysis. *See* ECF 25 at 5–6. The D.C. Circuit has explained that "when evaluating under the Due Process Clause an individual's contacts with the forum state, courts cannot ignore contacts made by the individual just because they were made in his or her capacity as an employee or corporate officer." *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 46 (D.C. Cir. 2020). As a result, "under certain circumstances, individual defendants can fairly be haled into court based on actions they took on behalf of their business organization." *Tierney v. de Wet*, 695 F. Supp. 3d 69, 86 (D.D.C. 2023). The Court finds that it can consider actions taken by Defendants in their work capacities in assessing personal jurisdiction.

But even after considering Defendants' work-related actions, the Court agrees with Defendants that Saha has not demonstrated that they meet the requirements of the D.C. long-arm statute. While there is no "mechanical test for determining whether a court has personal jurisdiction over an individual defendant who acted on behalf of an organization," the Court looks to certain factors related to the extent and nature of Defendants' contacts with the District in their work capacity. *Id*. To find jurisdiction under subsection (a)(4), courts in this district have required that plaintiffs demonstrate defendants' ties to the District include a "plus factor" that shows some "reasonable connection between the [forum] and the defendant." *Hindu Am. Found. v. Viswanath*, 646 F. Supp. 3d 78, 94 (D.D.C. 2022). "The purpose of the plus factor is to filter out cases in which the in[-]forum impact is an isolated event and the defendant otherwise has no, or scant, affiliations with the forum." *Id*. At a minimum, the contacts must be "continuing in character." *Id*.

Plaintiff has failed to show that either Defendant has continuing ties to the District that satisfy a finding of jurisdiction under the long-arm statute. Defendants live and work in other states. *See* ECF 5-2 ¶ 2 (Themelis stating that he is a resident of New Hampshire); ECF 22-2 ¶ 2 (Bennetsen stating that he is a resident of Arizona). They work for a company that, by Plaintiff's own account, is incorporated in Delaware and headquartered in New York. ECF 25 at 2 (Plaintiff's brief citing Teladoc's SEC filings). As part of their work, they were drawn into an employment dispute over Plaintiff's work performance. Plaintiff happened to live and work in the District and Defendants' jobs required them to communicate with her and file a report about her. For Themelis, Plaintiff's allegations focus on his submission of a report to the NPDB. ECF 1-2 ¶ 3. For Bennetsen, Plaintiff argues that their email correspondence amounts to a course of conduct in the District. ECF 25 at 4. Both allegations focus on out-of-state actions that were transmitted towards the District. But courts have held that the relevant conduct itself needed to *occur in* the District,

9

not merely be directed at a District resident or entity. *See FC Inv. Grp. LC v. IFX Mkts., Ltd*., 529 F.3d 1087, 1096 n.9 (D.C. Cir. 2008), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883, 891 (D.C. Cir. 2021) (stating that "regular" telephone calls to D.C. are insufficient to establish jurisdiction); *FutureGen Co. v. Carter*, 915 F. Supp. 2d 104, 108 (D.D.C. 2013) (explaining that the D.C. long-arm statute "requires that the persistent course of conduct occur *in* the District; directing conduct from another state into the District via telephone, internet, and mail is insufficient"). In sum, Plaintiff has alleged isolated incidents in which Defendants have sent communications to the District, without any ongoing ties or activities in the forum. Her complaint is thus "devoid of any facts establishing a real connection between Defendants and the District." *Viswanath*, 646 F. Supp. 3d at 95. As a result, the Court will dismiss Plaintiff's suits against Themelis and Bennetsen for lack of personal jurisdiction under Rule 12(b)(2).

### 2. *The Court will deny Saha's request for jurisdictional discovery.*

Saha argues that, in the event the Court finds that it lacks personal jurisdiction, the Court should permit her to conduct jurisdictional discovery. ECF 10-1 at 3; ECF 25 at 4. Saha fails to show that additional discovery could cure the jurisdictional problems underlying her complaint. Additionally, even if the Court could exercise jurisdiction over Themelis and Bennetsen, Saha would fail to state a claim against them for the same reasons explained below as to Teladoc. As a result, jurisdictional discovery would be futile in this case.

"This Circuit's standard for permitting jurisdictional discovery is quite liberal." *Diamond Chem. Co. v. Atofina Chems., Inc*., 268 F. Supp. 2d 1, 15 (D.D.C. 2003). "[H]owever, in order to get jurisdictional discovery a plaintiff must have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998). Moreover, "a

plaintiff must make a 'detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce.'" *Atlantigas Corp. v. Nisource, Inc*., 290 F. Supp. 2d 34, 53 (D.D.C. 2003) (quoting *Philip Morris*, 116 F. Supp. 2d at 130 n.16). "Where there is no showing of how jurisdictional discovery would help plaintiff discover anything new, it [is] inappropriate to subject [defendants] to the burden and expense of discovery." *Id*.

Saha does not make the necessary showing. She requests discovery related to Teladoc's operations in D.C. and the role Themelis and Bennetsen played in such D.C.-based operations. *See* ECF 10-1 at 2; ECF 25 at 4–7. Saha states that "it is difficult to believe that corporate Teladoc which bragged in its 2022 Annual Report that it reached 50 million virtual visits . . . had no interactions in the District of Columbia." ECF 10-1 at 2. She also cites to a 2024 SEC report filed by Teladoc stating that "Teladoc Health empowers *all people everywhere* to live their healthiest lives," seemingly implying that "all people" includes residents of D.C. ECF 25 at 2–3. Relying on the inference that Teladoc has operations in D.C., Saha maintains that discovery is needed to ascertain whether Themelis and Bennetsen also had contacts with D.C. on behalf of Teladoc. For Themelis, Saha does not detail any particular discovery she plans to request. *See* ECF 10-1 at 2. For Bennetsen, Saha lists nine discovery requests related to his role at Teladoc. *See* ECF 25 at 6–7. For example, she requests Bennetsen's written agreement with Teladoc, a list of his responsibilities at Teladoc, his contacts with the D.C. Department of Health and other governmental entities, and the current status of his employment with Teladoc. *Id.* She also claims that jurisdictional discovery is needed regarding whether "the tortious act [was] part personal and part business" and whether "Defendant Bennetsen and other parties including Teladoc [were]

independent joint tortfeasors." *Id.* at 7.[4] The Court declines to order discovery based on these representations by Saha.

The Court does "not see how any" of the requested information would cure Saha's "failure to tie her jurisdictional theory" to Bennetsen and Themelis in particular, not Teladoc broadly. *See Livnat v. Palestinian Auth.*, 851 F.3d 45, 58 (D.C. Cir. 2017). Here, Teladoc has not moved to dismiss for lack of personal jurisdiction. There is no dispute for this Court to resolve regarding Teladoc's contacts with the District of Columbia, but the thrust of Saha's requested discovery turns almost entirely on Teladoc's contacts with D.C. Saha does not offer any good-faith belief or basis as to why, if Teladoc had interactions with D.C., Themelis or Bennetsen must have, too, especially in the face of two sworn declarations attesting to the opposite. *See Viswanath*, 646 F. Supp. 3d at 95 ("[A]s a general rule, courts cannot exert jurisdiction over individual corporate officers or employees just because the court has jurisdiction over the corporation."). Accordingly, "mere conjecture [and] speculation" regarding Themelis and Bennetsen's business conduct on behalf of Teladoc in D.C. cannot support a request for jurisdictional discovery. *FC Inv. Grp.*, 529 F.3d at 1094; *see also Atlantigas Corp.*, 290 F. Supp. 2d at 53 (denying plaintiff's request for jurisdictional discovery "to confirm that the . . . [d]efendants have customers in the District of Columbia or otherwise 'transact business' in the District of Columbia" because "[s]uch generalized predictions are not enough to justify jurisdictional discovery").

Even if Saha could remedy the jurisdictional defects via discovery, as the Court will explain below, her claims against Themelis and Bennetsen are otherwise subject to dismissal for failure to

---

[4] With respect to Themelis only, Saha requests discovery as to whether the "100-mile bulge rule" is applicable because the NPDB, the entity he submitted notice of her resignation to, is purportedly located in Fairfax or Chantilly, Virginia. ECF 10-1 at 2. But, as already explained above, transmitting a document from out-of-state would be insufficient to establish jurisdiction, regardless of whether it was received within 100 miles of the District.

state a claim. Because Saha fails to plausibly state a claim against any Defendant, the Court separately finds that any discovery would be futile and it is thus "inappropriate to subject [Defendants] to the burden and expense of discovery." *Id.*; *see also Geier v. Conway, Homer & Chin-Caplan, P.C.*, 983 F. Supp. 2d 22, 38 (D.D.C. 2013). As such, the Court declines to allow jurisdictional discovery in this case.

### B. Under Rule 12(b)(6), Saha has failed to state a claim against any Defendant.

Saha brings a tortious interference with contract claim and an interference with economic expectation claim against Defendants. She fails to state either claim. As a result, the Court dismisses all claims against Teladoc under Rule 12(b)(6). The Court also finds that, in the alternative, Plaintiff's claims against Themelis and Bennetsen also fail under Rule 12(b)(6).

To state a claim of tortious interference with contract in the District of Columbia, a plaintiff must allege: "(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach." *Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d 33, 56 (D.D.C. 2010) (citation omitted), *aff'd*, 748 F.3d 1285 (D.C. Cir. 2014). "A tortious interference with prospective economic advantage claim has identical elements, except that the plaintiff must demonstrate the existence, knowledge, and intentional procurement of a breach of a prospective advantageous business transaction instead of meeting those elements as to a contract." *Id.* (citing *Casco Marina Dev., LLC v. Dist. of Columbia Redev. Land Agency*, 834 A.2d 77, 84 (D.C. 2003)). The existence of a valid contract or business relationship of expectancy "require[s] rather specific business opportunities," not just "generic opportunities of any successful enterprise." *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 29 (D.C. Cir. 2010). Indeed, "tortious interference claims are routinely dismissed where the plaintiff fails to name specific contractual relationships that the defendant allegedly interfered with, or to

identify any facts related to future contracts compromised by the alleged interferer." *Nyambal v. Alliedbarton Sec. Servs., LLC*, 153 F. Supp. 3d 309, 316 (D.D.C. 2016), *recons. granted on other grounds*, 344 F. Supp. 3d 183 (D.D.C. 2018).

Teladoc asserts that Saha has not pled sufficient facts to state a claim because "[o]ther than a cursory mention that 'all Defendants' knew that Dr. Saha would become ineligible for future employment as a physician, Plaintiff never alleges facts to demonstrate that Teladoc knew of the existence of a contract or business relationship or expectancy" or "that Teladoc intentionally procured a breach of any contract or interfered with any business relationship or expectancy." ECF 6-1 at 4–5. In the alternative, Teladoc argues that even if Saha sufficiently stated a claim, the claim still fails because Teladoc's conduct was "justified or privileged." ECF 6-1 at 5–6 (citing *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads Inc.*, 565 A.2d 285, 290 (D.C. 1989)). Saha responds that the "complaint set out [her] education, background, training and employment," and alleged that Teladoc knew that "Saha throughout her career was employed as an itinerant contractor providing medical services." ECF 11-1 at 3, 9.[5] Given her professional background, Saha claims she has sufficiently stated an "ongoing career solely interrupted by Defendant's acts." *Id.* at 3–5. The Court agrees with Teladoc that Saha's conclusory allegations fail to state a claim.

Reading the complaint charitably, the Court understands Saha's overall theory to be that Defendants' actions caused her "former and prospective clients" to "decline[] to hire and otherwise retain" her. ECF 1-2 ¶ 75. But her allegations are unclear. To start, Saha does not describe exactly what Defendants did. Her complaint largely reproduces the email messages between her and

---

[5] At one point in her opposition, Saha appears to raise a new claim, asserting that Defendants' "tortious conduct" was the making of a report that "was false and the person or entity providing the information knew the information was false," in contravention of D.C. Code § 44-802. ECF 11-1 at 9. But this claim, raised for the first time in Saha's opposition, is not properly before this Court. *See Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.").

Bennetsen, which only go to the details of her performance review. *See id.* at 19–24. Saha alleges Bennetsen "supplied false, unqualified, misleading or incomplete information to [her]" while knowing she "would justifiably rely on this information in the timing and manner of her resignation from Teladoc." *Id.* ¶¶ 45, 49. But Saha does not identify what the false information was or how she relied upon it in resigning. Likewise, Saha alleges Teladoc, through its employees, "prepared documents and made oral statements which were intentionally false, unqualified, misleading or incomplete," *id.* ¶ 66, but does not describe what the statements were or how they were false, misleading, or incomplete. Indeed, Saha does not even allege what the purported NPDB report says. In an email, Bennetsen informs Saha that declining the performance review "would be considered a resignation while under formal review and may trigger a [NPDB] report." *Id.* ¶ 33. But later, Saha only alleges that she received notification from the NPDB that her "resignation was required to be listed." *Id.* ¶ 41. Even if the Court could piece together Defendants' purported actions, however, Saha cannot state a tortious interference claim.

Other than cursory mentions of general employment opportunities, Saha does not allege that any particular contract or contemplated transaction existed. Nor does Saha identify any existing contract that Teladoc had knowledge of and allegedly interfered with. The only hint of a specific employment relationship in the complaint is where Saha informs Bennetsen that, in addition to Teladoc, she is also working at a hospital. *See* ECF 1-2 ¶ 36 (Saha noting that she did not complete additional Teladoc consults because she "was asked to help out in the hospital"). But at no point does Saha, for instance, allege that the hospital Bennetsen presumably had knowledge of terminated its contract with her as a result of Defendants' NPDB report. Her only allegation to this point is that a broad category of "former and prospective clients"—who she does not allege Teladoc had any particular knowledge of—"declined to hire and otherwise retain" her as a result

of Defendants' unspecified actions. *Id.* ¶ 75. To withstand a motion to dismiss, however, Saha must "name specific contractual relationships" that Teladoc was aware of and intentionally interfered with. *Nyambal*, 153 F. Supp. 3d at 316. Her failure to do so warrants dismissal of her tortious interference with contract claim. *Id.*; *see also Sharpe v. Am. Acad. of Actuaries*, 285 F. Supp. 3d 285, 292 (D.D.C. 2018) (dismissing tortious interference claim where plaintiff failed to "plead the specific contracts or expectancies that the Plaintiff claims were interfered with, as he is required to do"); *DC2NY, Inc. v. Acad. Bus, LLC*, No. 18-cv-2127 (RC), 2019 WL 3779571, at *8 (D.D.C. Aug. 12, 2019) (dismissing tortious interference claim where "[i]nstead of naming a relationship with a specific third party or class of third parties, the claims merely allege lost business").

Saha's interference with prospective economic advantage claim fares no better. Saha argues that, given her academic and professional background as a board-certified physician, she has sufficiently stated a reasonable expectation of future employment opportunities that were denied due to Defendants' (unspecified) misrepresentations. *See* ECF 11-1 at 3–4. But again, other than a general reference to "former and prospective clients," ECF 1-2 ¶ 75, the complaint does not identify any particular transactions, employment, or referrals Saha would have received but for Defendants' conduct. *See Guttenberg v. Emery*, 41 F. Supp. 3d 61, 73 (D.D.C. 2014) (allegations of "disparaging comments" made to the medical community that had "caus[ed] [other] doctors to terminate their referrals to Plaintiffs" were not a sufficient basis for a tortious interference claim because they amounted to only "general allegations of harm to their business," without details such as "examples of referrals which they would have received but for defendants' conduct."). Indeed, Saha's allegations are no different than those rejected by the D.C. Circuit in *Jankovic*, 593 F.3d at 29. There, the court affirmed dismissal of an interference claim where the plaintiff similarly alleged

16

"a loss of current growth and business opportunities [and] a loss of future growth and business opportunities." *Id.* (explaining that the loss of such "generic opportunities of any successful enterprise" cannot form the basis of an intentional interference claim).

Saha tries to cast her complaint as in line with cases where courts have found interference, *see* ECF 11-1 at 5, but her broad allegations bear little resemblance to those cases involving "specific anticipated transactions." *Id*. For example, in *Browning v. Clinton*, the D.C. Circuit noted that the plaintiff's allegation that she "'had a reasonable expectation' of selling her book to a publisher, might, standing alone fall short" of stating an interference claim. 292 F.3d 235, 243–44 (D.C. Cir. 2002). But Browning's claim survived because she identified a specific example of a prospective publishing contract that was allegedly terminated due to the defendant's conduct. *Id.* Similarly, in *Banneker Ventures, LLC v. Graham*, the D.C. Circuit held that a plaintiff had stated an interference claim where it identified a "prospective final agreement" with WMATA that the defendant's actions allegedly interfered with. 798 F.3d 1119, 1135 (D.C. Cir. 2015). Saha has made no similar allegations here. Instead, her reliance on general categories of lost "clients" is analogous to claims that are consistently dismissed by courts. *See Jankovic*, 593 F.3d at 29; *Xereas v. Heiss*, 933 F. Supp. 2d 1, 11 (D.D.C. 2013) (collecting cases) (plaintiff failed to state a claim for tortious interference because he only generally alleged that defendants interfered with his "long standing business relationships" and his "ability to maintain contact and relationships, and continue doing business" with "current and prospective customers and industry players"); *Uzoukwu v. Metro. Wash. Council of Gov'ts*, 983 F.Supp.2d 67, 90 (D.D.C. 2013) ("Plaintiff's vague assertions that she was unable to find a job after her termination" were insufficient to show that the defendant "intentionally interfered . . . with any prospective business advantage that was commercially reasonable to expect.").

Because the Court agrees with Teladoc that Saha fails to state a claim in the first instance, it need not consider Teladoc's alternative grounds for dismissal premised on privileged or justified conduct. Accordingly, Saha fails to state a tortious interference with contract claim or an interference with economic expectation claim against Teladoc.

<div align="center">*     *     *</div>

For the foregoing reasons, Themelis' and Bennetsen's motions to dismiss, ECF 5, 22, are **GRANTED** for lack of personal jurisdiction and, in the alternative, for failure to state a claim. Additionally, Teladoc's motion to dismiss for failure to state a claim, ECF 6, is **GRANTED**. This case is **DISMISSED**. A separate order accompanies this memorandum opinion.

        **SO ORDERED.**

<div style="margin-left: 40%;">
_____<br>
JIA M. COBB<br>
United States District Judge
</div>

Date: September 30, 2025